UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**NEW ENGLAND ANTI-VIVISECTION**      )
       **SOCIETY**,      )
333 Washington St., Suite 850      )
Boston, Massachusetts 02108,      )
      )
**FAUNA FOUNDATION**,      )
3802 Chemin Bellerive      )
Carignan Quebec J3L 3P9      )
Canada,      )
      )
**PRIMATE RESCUE CENTER**,      )
2515 Bethel Road      )
Nicholasville, Kentucky 40356,      )
      )
**CHIMPS, INC.,**      )
65525 Gerking Market Road      )
Bend, Oregon 97703,      )     Civ No.
      )
**JUNGLE FRIENDS PRIMATE SANCTUARY**,  )
13915 N State Rd. 121      )
Gainesville, Florida 32653,      )
      )
**CRUELTY FREE INTERNATIONAL**,      )
16a Crane Grove      )
London, N7 8NN      )
United Kingdom      )
      )
      )
**TERRI HUNNICUTT**,      )
4160 US 64/74 A Hwy      )
Rutherfordton, North Carolina 28139,      )
      )
**JENNIFER FEUERSTEIN,**      )
3304 Meadow Lane      )
Fort Pierce, Florida   34947      )
      )
and      )
      )
**MARY LEE JENSVOLD**,      )
12491 Upper Badger Pocket Rd.      )
Ellensburg, Washington   98926      )

|  |  |
|---|---|
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| **SALLY JEWELL**, Secretary, | ) |
| Department of the Interior, | ) |
| 1849 C Street, N.W. | ) |
| Washington, D.C.   20240, | ) |
| | ) |
| **DAN ASHE**, Director | ) |
| Fish and Wildlife Service, | ) |
| 1849 C Street, N.W. | ) |
| Washington, D.C.   20240, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs challenge an unprecedented and highly controversial decision by the

United States Fish and Wildlife Service ("FWS") to issue a permit under section 10 of the

Endangered Species Act ("ESA" or Act), 16 U.S.C. § 1531, *et seq.*, to Yerkes National Primate

Center in Atlanta, Georgia ("Yerkes") authorizing Yerkes to export eight chimpanzees – Lucas,

Fritz, Agatha, Abby, Tara, Faye, Elvira, and Georgia – to the Wingham Wildlife Park

("Wingham"), an unaccredited zoo in Kent, England.   This permit is the first of its kind to be

issued regarding the export of *captive* chimpanzees since the captive members of the chimpanzee

species were officially listed as "endangered" under the ESA, effective September 14, 2015.

In deciding to issue the permit to Yerkes, the FWS violated the requirements of Section 10 of the

statute which governs such decisions, as well as the agency's own implementing regulations and

obligations under the Convention on International Trade in Endangered Species of Flora and

Fauna (CITES), 27 U.S.T. 1087 (Mar. 3, 1973), and the treaty's implementing regulations.

2.      In reaching its decision, the FWS also failed to comply with *any* of the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* i.e., it did not prepare an Environmental Assessment or Environmental Impact Statement, as required by that statute.    The FWS also violated its obligation to consider the adverse impacts of its decision on efforts to conserve chimpanzees in the wild, even though Wingham clearly intends to breed the eight chimpanzees to create infant chimpanzees, which, in turn will serve to fuel a desire for infant chimps, and thus the already devastating black market in infant chimpanzees taken from the wild for the pet and entertainment industries.    The FWS also failed to consider the precedential effect its decision will have on the disposition of other captive chimpanzees that have now been finally listed as "endangered" under the Act.    The FWS also failed to consider any alternative courses of action – a particularly glaring omission in light of the fact that several accredited U.S. chimpanzee sanctuaries have expressed a willingness to provide homes for these eight chimpanzees.

## JURISDICTION

3.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## PARTIES

4.      Plaintiff New England Anti-Vivisection Society ("NEAVS"), a non-profit organization founded in 1895, is a national animal advocacy organization dedicated to ending the use of animals in research, testing, and science education. Through research, outreach, education, legislation, and policy change, NEAVS advocates for replacing animals in biomedical research with modern non-animal alternatives that are ethically, humanely, and scientifically superior.    It has spent many years and considerable resources advocating for protections for captive

chimpanzees, particularly chimpanzees used in laboratory research, and was one of the

petitioners that filed a petition in 2010 with the FWS to have the captive members of the

chimpanzee species be included in the "endangered" listing for the species so that the captive

members would be afforded all of the protections extended to an endangered species under the

ESA.   NEAVS has also spent many years and resources advocating for the retirement of

chimpanzees used in research laboratories, including chimpanzees used by Yerkes, and

advocating that such chimpanzees be retired to chimpanzee sanctuaries in the United States

where they can live out the remainder of their lives in settings that mimic their natural habitats to

the greatest extent possible, with other chimpanzees, and without being commercially exploited

or bred for such purposes.   NEAVS is a membership organization and brings this case on its

own behalf and on behalf of its members.

5.      Essential to its work is NEAVS' ability to obtain information from governmental

entities, including the FWS, concerning issues affecting animals maintained in or from

laboratory settings.   NEAVS routinely gathers information on actions proposed by the U.S. and

other governments that affect such animals, and it specifically monitors applications for permits

that will affect such animals, including permits issued by the FWS.   NEAVS also informs its

members and the general public about proposed governmental actions concerning laboratory

animals through various means, including, but not limited to electronic action alerts and other

postings, press releases, and NEAVS' website.

6.      As part of its advocacy on these issues, when it learned that Yerkes wanted to

dispose of the chimpanzees in its possession, NEAVS made every effort to ensure that all such

chimpanzees are relocated to U.S. sanctuaries, and it has spent time and resources on helping to

identify those sanctuaries that are willing to accept the chimpanzees, including the eight

chimpanzees at issue in this case.   NEAVS has written letters to both Yerkes and Emory

University concerning such efforts, and it has also pledged life-time support for one of the eight

chimpanzees, Georgia, if she were sent to a U.S. sanctuary.

7.     When NEAVS learned that Yerkes had applied for an export permit under CITES,

it submitted evidence to the FWS concerning the adverse impact such export would have on the

chimpanzees and urged the FWS to deny the permit.   Likewise, when the FWS published in the

Federal Register notice of Yerkes' application for a Section 10 permit to export the eight

chimpanzees pursuant to the ESA, NEAVS obtained all of the information the FWS made

publicly available concerning that application and spent time and resources collecting and

submitting extensive comments opposing the issuance of the permit.

8.     Defendants' unlawful actions in deciding to grant Yerkes both a CITES export

and ESA Section 10 permit to export the eight chimpanzees to an unaccredited zoo in England

injures NEAVS in myriad ways.   By basing this decision on information that was not provided

to NEAVS during the public comment period on the requested permit, as required by Section

10(c) of the ESA, Defendants violated NEAVS's and its members' statutory right to obtain such

information as mandated for each such application under Section 10, and they have denied

NEAVS and its members a meaningful opportunity to submit "written data, views, or arguments

with respect to the application" as further required under Section 10 (c) of the ESA, 16 U.S.C. §

1539(c).   These violations of Section 10 have also deprived NEAVS of the ability to keep its

members and the public fully informed about the intended export of these eight chimpanzees,

and NEAVS has had to spend – and will continue to spend – financial and other resources

pursuing alternative sources of information regarding this matter, including, but not limited to, pursuing such information pursuant to the Freedom of Information Act.   As a result of Defendants' unlawful actions, if the eight chimpanzees are in fact exported to Wingham, NEAVS will also have to spend additional resources monitoring what happens to those animals and their progeny, and advocating for their protection under the laws that will apply to such activities in the United Kingdom and elsewhere. This in turn causes a drain on NEAVS' already limited resources that could be spent on other activities needed to further NEAVS' mission to protect laboratory animals.   NEAVS is also injured by Defendants' failure to comply with any of the requirements of NEPA, including those requirements that ensure public involvement in the agency's decision-making process, and the agency's obligation to consider reasonable alternatives to the proposed action.

9.     NEAVS's injuries will be redressed if Plaintiffs prevail in this action because, as a result, the FWS will be required under Section 10 of the ESA to deny Yerkes' permit and, should Yerkes wish to reapply for such a permit, the FWS would be required to make available to NEAVS *all* of the information upon which Yerkes may rely in seeking such a permit, and would also be required to allow NEAVS a thirty-day comment period during which NEAVS could submit "written data, views, or arguments" concerning such materials and whether any such permit should be issued.     In addition, should Plaintiffs prevail in this action, and the FWS's decision to issue the requested permit is set aside, Yerkes will have to pursue alternative locations to which to send the eight chimpanzees, including U.S. sanctuaries – because it can no longer engage in activities that "take" these endangered animals within the meaning of the ESA

– and NEAVS will not have to spend any resources on monitoring how these eight chimpanzees and their progeny are treated in a foreign country.

10.     Plaintiff Fauna Foundation ("Fauna") is a nonprofit sanctuary in Quebec, Canada, created to provide a haven for neglected and abused farm and domestic animals and former biomedical research chimpanzees.   It aims through education to foster a better understanding of all animals while exploring humans' ethical responsibility for the well-being of all earth's creatures.   It spends resources on being informed about the plight of animals, including animals used in research, particularly chimpanzees, and it submitted comments to the FWS concerning Yerkes' application for an export and enhancement permit to transfer eight chimpanzees to Wingham.   Fauna is injured by the unlawful actions of Defendants because, as an "interested part[y]" within the meaning of Section 10(c) of the ESA, it has been deprived of information upon which the FWS has based the decision to issue the requested permits to Yerkes.   Fauna has also been deprived of its ability to submit "written data, views, or arguments" with respect to Yerkes' application, as further provided by Section 10(c) of the ESA.   Fauna's injuries will be redressed if Plaintiffs prevail, because if the FWS's decision to issue the requested permits is set aside, and Yerkes is required to submit a new application for such permits, the FWS will be required to provide the Foundation with all of the information mandated by Section 10 of the ESA and also to afford the Foundation a meaningful opportunity to comment on such information before the FWS makes a final decision regarding any such permit application.

11.     Plaintiff Primate Rescue Center ("Center") is a nonprofit sanctuary in Kentucky that provides lifetime care to more than fifty monkeys and apes, including eleven chimpanzees. In addition, it strives to alleviate the suffering of primates everywhere by working to strengthen

animal protection laws and end the private trade in these animals, both in the U.S. and abroad. It spends resources on being informed about the plight of animals, including animals used in research, and particularly chimpanzees, and it submitted comments to the FWS concerning Yerkes' application for an export and enhancement permit to transfer eight chimpanzees to Wingham.   The Center is injured by the unlawful actions of Defendants because, as an "interested part[y]" within the meaning of Section 10(c) of the ESA, it has been deprived of information upon which the FWS has based its decision to issue the requested permits to Yerkes, and it has also been deprived of its ability to submit "written data, views, or arguments" with respect to Yerkes' application, as further provided by Section 10(c) of the ESA.   The Center's injuries will be redressed if Plaintiffs prevail because if the FWS's decision to issue the requested permits is set aside, and Yerkes is required to submit a new application for such permits, the FWS will be required to provide the Center with all of the information mandated by Section 10 of the ESA and also to afford the Center a meaningful opportunity to comment on such information before the FWS makes a final decision regarding any such permit application.

12.     Plaintiff Chimps Inc. is a non-profit sanctuary in Bend, Oregon specifically designed to provide lifetime care to captive chimpanzees rescued or retired from the pet and entertainment industries, and willing to take chimps retired from research. It is dedicated to overcoming the exploitation and cruelty that chimpanzees face, through advocacy, conservation, education and outreach.   It spends resources on being informed about the plight of chimpanzees, and it submitted comments to the FWS concerning Yerkes' application for an export and enhancement permit to transfer eight chimpanzees to Wingham.   Chimps, Inc. is injured by the unlawful actions of Defendants because, as an "interested part[y]" within the

meaning of Section 10(c) of the ESA, it has been deprived of information upon which the FWS

has based its decision to issue the requested permits to Yerkes, and it has also been deprived of

its ability to submit "written data, views, or arguments" with respect to Yerkes' application, as

further provided by Section 10(c) of the ESA.   Chimp Inc.'s injuries will be redressed if

Plaintiffs prevail, because if the FWS's decision to issue the requested permits is set aside, and

Yerkes is required to submit a new application for such permits, the FWS will be required to

provide the organization with all of the information mandated by Section 10 of the ESA and also

to afford the organization a meaningful opportunity to comment on such information before the

FWS makes a final decision regarding any such permit application.

13.     Plaintiff Jungle Friends Primate Sanctuary ("Jungle Friends") is a non-profit

organization in Gainesville, Florida that provides permanent, high-quality sanctuary care for

New World monkeys being retired from laboratory research, ex-pets, or monkeys who have been

confiscated by governmental authorities.   It works cooperatively with a national network of

credible animal sanctuaries, including all US accredited chimpanzee sanctuaries, government

agencies, primate and animal protection organizations, and qualified individuals to find

placement for unwanted monkeys and to combat the exploitation and mistreatment of captive

primates.   Jungle Friends is committed to advocacy and education on behalf of all captive non-

human primates, and to providing assistance to improve the circumstances of captive primates

wherever possible.   It spends resources on being informed about the plight of primates,

including captive chimpanzees, and it submitted comments to the FWS concerning Yerkes'

application for an export and enhancement permit to transfer eight chimpanzees to Wingham.

Jungle Friends is injured by the unlawful actions of Defendants because, as an "interested

part[y]" within the meaning of Section 10(c) of the ESA, it has been deprived of information

upon which the FWS has based its decision to issue the requested permits to Yerkes, and it has

also been deprived of its ability to submit "written data, views, or arguments" with respect to

Yerkes' application, as further provided by Section 10(c) of the ESA.   Jungle Friends' injuries

will be redressed if Plaintiffs prevail, because if the FWS's decision to issue the requested

permits is set aside, and Yerkes is required to submit a new application for such permits, the

FWS will be required to provide the organization with all of the information mandated by

Section 10 of the ESA and also to afford the organization a meaningful opportunity to comment

on such information before the FWS makes a final decision regarding any such permit

application.

14.     Plaintiff Cruelty Free International ("Cruelty Free") is a non-profit organization

dedicated to ending animal experiments worldwide.   It carries out its mission by investigating

and exposing the reality of life for animals in laboratories, being informed about government

actions that affect such animals, and urging decision-makers to make a positive difference for

animals.    In furtherance of its mission, it submitted comments to the FWS concerning Yerkes'

application for an export and enhancement permit to transfer eight chimpanzees to Wingham.

Cruelty Free is injured by the unlawful actions of Defendants because, as an "interested part[y]"

within the meaning of Section 10(c) of the ESA, it has been deprived of information upon which

the FWS has based its decision to issue the requested permits to Yerkes, and it has also been

deprived of its ability to submit "written data, views, or arguments" with respect to Yerkes'

application, as further provided by Section 10(c) of the ESA.   The group's injuries will be

redressed if Plaintiffs prevail, because if the FWS's decision to issue the requested permits is set

aside, and Yerkes is required to submit a new application for such permits, the FWS will be

required to provide the group with all of the information mandated by Section 10 of the ESA and

also to afford it a meaningful opportunity to comment on such information before the FWS

makes a final decision regarding any such permit application.

15.     Plaintiff Jennifer Feuerstein is a biologist with over 17 years of experience in

caring for approximately hundreds of chimpanzees, in both a laboratory and sanctuary setting,

and is a former caregiver for three of the chimpanzees that are the subject of the Yerkes' permits

at issue in this case – Georgia, Tara, and Abby.    Ms. Feuerstein worked with and took care of

these chimpanzees from 1997 to 2003.    During that time, she formed a strong emotional bond

with these chimpanzees.    She enjoyed their company and seeing and observing them on a

regular basis, and very much enjoyed learning about and experiencing their very different

personalities and characteristics.    She thinks about these chimpanzees often and misses them

terribly.    She very much wants to visit them again to enjoy their company, which she would be

able to do if the chimpanzees were relocated to a U.S. sanctuary.    She is injured by Defendants'

unlawful actions because, as a result, if the eight chimpanzees are exported to Wingham, they

will be separated from their established social groups and placed on exhibition in a unaccredited

zoo in a foreign country – all of which will impair her ability to enjoy visiting and observing

these animals in a more humane setting.    If the chimpanzees are instead relocated to a U.S.

sanctuary, Ms. Feuerstein will visit them as often as possible, and has every reason to believe

that she would be able to do so.

16.     Ms. Feuerstein also commented on Yerkes' application for an export and

enhancement permit to export the eight chimpanzees to Wingham.    She is further injured by the

unlawful actions of Defendants because, as an "interested part[y]" within the meaning of Section 10(c) of the ESA, she has been deprived of information upon which the FWS has based its decision to issue the requested permits to Yerkes, and has also been deprived of her ability to submit "written data, views, or arguments" with respect to Yerkes' application, as further provided by Section 10(c) of the ESA.    Ms. Feuerstein's injuries will be redressed if Plaintiffs prevail in this action, because if the FWS's decision to issue the requested permits is set aside, and Yerkes is required to submit a new application for such permits, the FWS will be required to provide Ms. Feuerstein with all of the information mandated by Section 10 of the ESA and also to afford her a meaningful opportunity to comment on such information before the FWS makes a final decision regarding any such permit application.

17.    Plaintiff Terri Hunnicutt also worked at Yerkes and is a former caregiver for Georgia, Tara, and Abby.    Ms. Hunnicutt also commented on Yerkes' application for an export and enhancement permit to export the eight chimpanzees to Wingham.    She is injured by the unlawful actions of Defendants because, as an "interested part[y]" within the meaning of Section 10(c) of the ESA, she has been deprived of information upon which the FWS has based its decision to issue the requested permits to Yerkes, and has also been deprived of her ability to submit "written data, views, or arguments" with respect to Yerkes' application, as further provided by Section 10(c) of the ESA.    Ms. Hunnicutt's injuries will be redressed if Plaintiffs prevail in this action because if the FWS's decision to issue the requested permits is set aside, and Yerkes is required to submit a new application for such permits, the FWS will be required to provide Ms. Hunnicutt with all of the information mandated by Section 10 of the ESA and also

to afford her a meaningful opportunity to comment on such information before the FWS makes a final decision regarding any such permit application.

18.     Mary Lee Jensvold is the former Director of the Chimpanzee and Human Communications Institute at Central Washington University, a behavioral research center dedicated to studying chimpanzee communications and American Sign Language in chimpanzees, and an officer of the board of Friends of Washoe, a U.S. non-profit organization that cared for a family of chimpanzees.     She brings this case in her individual capacity only. Because of her professional and personal interests in the well-being of captive chimpanzees, Dr. Jensvold commented on Yerkes' application for an export and enhancement permit to export the eight chimpanzees to Wingham.     She is injured by the unlawful actions of Defendants because, as an "interested part[y]" within the meaning of Section 10(c) of the ESA, she has been deprived of information upon which the FWS has based its decision to issue the requested permits to Yerkes, and has also been deprived of her ability to submit "written data, views, or arguments" with respect to Yerkes' application, as further provided by Section 10(c) of the ESA.     Dr. Jensvold's injuries will be redressed if Plaintiffs prevail in this action, because if the FWS's decision to issue the requested permits is set aside, and Yerkes is required to submit a new application for such permits, the FWS will be required to provide her with all of the information mandated by Section 10 of the ESA and also to afford her a meaningful opportunity to comment on such information before the FWS makes a final decision regarding any such permit application.

19.     Defendant Jewell is the Secretary of the Department of the Interior and has ultimate authority for decisions issued under the ESA, CITES, and NEPA.

20.     Defendant Ashe is the Director of the FWS and has been delegated responsibility by the Secretary of the Department of the Interior to ensure compliance with the ESA, CITES, and NEPA.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE
## TO PLAINTIFFS' CLAIMS FOR RELIEF

A.     **Statutory and Regulatory Framework**
      1.     **The Endangered Species Act**

21.     The ESA was enacted because of Congress' concern that species of fish, wildlife, and plants "have been so depleted in numbers that they are in danger of or threatened with extinction."   16 U.S.C. § 1531(a).   The statute pledges the United States "as a sovereign state in the international community to conserve to the extent practicable the various species of fish and wildlife and plants facing extinction," and it provides that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]." 16 U.S.C. § 1531(c).

22.     The ESA defines an "endangered species" as "any species which is in danger of extinction."   16 U.S.C. § 1532(6).

23.     Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(A) provides that it is unlawful to "export" any endangered species from the United States without permission from the FWS pursuant to the requirements of Section 10 of the ESA, 16 U.S.C. § 1539.

24.     Section 9 also prohibits the "taking" of any endangered species without a permit, 16 U.S.C. § 1538(a), and the term "take" is defined by the Act to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."

16 U.S.C. § 1532(19), and Section 9 further provides that it is unlawful to "possess, sell, deliver, carry, transport, or ship" any endangered species that is unlawfully taken.   16 U.S.C. § 1538(a).

25.     These prohibitions apply to endangered animals bred in captivity, as well as to those in the wild, unless a lawful Section 10 permit has been issued by the FWS.

26.     Section 10(a)(1)(A) of the ESA authorizes the FWS to issue a "permit" for any act that is otherwise prohibited by section 9, but only if such act is "for scientific purposes or to enhance the propagation or survival of the affected species."   16 U.S.C. § 1539(a)(1)(A).

27.     Section 10(c) further provides that the FWS "shall publish notice in the Federal Register of each application for an exemption or permit which is made under [section 10]," 16 U.S.C. § 1539(c), and requires that "[e]ach notice shall invite the submission from interested persons, within thirty days after the date of the notice, of written data, views or arguments with respect to the application . . .."   *Id.*   Section 10(c) also mandates that "[i]nformation received by the [FWS] as a part of any application *shall be available to the public as a matter of public record at every stage of the proceeding*."   *Id.* (emphasis added).

28.     The FWS may grant exceptions under section 10(a) "only if [it] finds and publishes . . . in the Federal Register that (1) such exceptions were applied for in good faith, (2) if granted and exercised will not operate to the disadvantage of such endangered species, and (3) will be consistent with the purposes and policy" of the Act.   16 U.S.C. § 1539(d).

29.     The FWS has issued regulations implementing section 10 of the ESA.   The regulations for obtaining permits for scientific purposes or for enhancement of the propagation or survival of the species are included at 50 C.F.R. § 17.22.

30.     Those regulations provide that in deciding whether to issue permits under Section 10 for the "enhancement of the propagation or survival of the species," the FWS "shall consider" various factors, including (a) "[t]he probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;" (b) "[w]hether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival of the population from which the wildlife sought to be covered by the permit was or would be removed;" (c) [w]hether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;" (d) the "opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application;" and (e) "[w]hether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application." 50 C.F.R. § 17.22(a)(2).

31.     The FWS's regulations further provide that in making decisions to issue an enhancement permit under Section 10 the agency "shall" also apply the general criteria that apply to all FWS permits, *id.*, which provide that the agency may not issue a permit if   "[t]he applicant *has failed to disclose material information required, or has made false statements as to any material fact, in connection with the application*," or "[t]he applicant has *failed to demonstrate a valid justification for the permit and a showing of responsibility*."   50 C.F.R. § 13.21(b)(2) - (3) (emphasis added).

32.     Any live wildlife possessed under a FWS permit "must be maintained under humane and healthful conditions."   50 C.F.R. § 13.41.

**2.** **The Convention on International Trade in Endangered Species.**

33.     The Convention on International Trade in Endangered Species of Flora and Fauna

("CITES"), 27 U.S.T. 1087 (Mar. 3, 1973), is an international treaty that was enacted to protect

wildlife by regulating international trade in endangered and threatened animals and plants, and

by empowering countries to preserve their own wildlife.

34.     CITES obliges its member parties, including the United States, to control wildlife

imports and exports by taking "appropriate measures" to enforce CITES and prohibit violations

of its provisions.   CITES, Article III.   In the United States, CITES is implemented by the

Endangered Species Act, 16 U.S.C. § 1531 *et seq*.     Accordingly, the ESA authorizes

enforcement of regulations that are issued pursuant to the authority of CITES and the ESA.   16

U.S.C. § 1540(g)(1)(A).

35.     International trade in wildlife is regulated under CITES by the listing of species in

one of three Appendices.   Species included in Appendix I are afforded the strictest trade

restrictions because they are "species threatened with extinction which are affected by trade."

Thus, CITES provides that "[t]rade in these species must be subject to particularly strict

regulation in order not to endanger further their survival and must only be authorized in

exceptional circumstances."   CITES, Article II.

36.     The chimpanzee, *Pan troglodytes*, is listed as an Appendix I species.

37.     However, because, according to Yerkes, the eight chimpanzees that are the

subject of the permit application were all bred in captivity for research purposes, the FWS

apparently   considers them to be Appendix II species under CITES.   *See* CITES, Article VII.

Before an export permit may be granted for an Appendix II species, the FWS must find that

export of the animals "will not be detrimental" to their survival, and that the animals will be "so

prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment."

CITES, Article IV.

### 3.     The National Environmental Policy Act

38.     The National Environmental Policy Act ("NEPA") is the nation's basic charter for

the protection of the environment.    NEPA makes it national policy to "use all practicable means

and measures . . .    to foster and promote the general welfare [and] to create and maintain

conditions under which [humans] and nature can exist in productive harmony."    42 U.S.C. §

4331(a).    NEPA's purposes are to "help public officials make decisions that are based on [an]

understanding of environmental consequences, and to take actions that protect, restore, and

enhance the environment."    40 C.F.R. § 1500.1(b)-(c).

39.     To accomplish these purposes, NEPA requires all agencies of the federal

government to prepare a "detailed statement" regarding all "major federal actions significantly

affecting the quality of the human environment."    42 U.S.C. § 4332(C).    This statement is

commonly referred to as an "Environmental Impact Statement" ("EIS").    NEPA further

provides that agencies "shall . . . study, develop, and describe appropriate alternatives to

recommended courses of action in any proposal which involves unresolved conflicts concerning

alternative uses of available resources."    *Id.* § 4332(2)(E).

40.     An EIS must describe (1) the "environmental impact of the proposed action," (2)

any "adverse environmental effects which cannot be avoided should the proposal be

implemented," and (3) alternatives to the proposed action.    42 U.S.C. § 4332.

41.     The Council on Environmental Quality ("CEQ") – an agency within the

Executive Office of the President – has promulgated regulations implementing NEPA that are

binding on all agencies, including the FWS.   *See* 40 C.F.R. §§ 1500-1508.

42.     The CEQ regulations provide that, where the agency has not determined whether

an EIS is required, it must generally prepare an "Environmental Assessment" ("EA") to

determine whether the environmental effects of its proposed action are "significant" and thereby

require the preparation of an EIS.   40 C.F.R. § 1501.4(b).   In determining whether an action is

"significant," the agency must consider "[t]he degree to which the effects on the quality of the

human environment are likely to be highly controversial;" "[t]he degree to which the action may

establish a precedent for future actions with significant effects or represent a decision in principle

about a future consideration;" the degree to which the action "may adversely affect an

endangered or threatened species;" the degree to which "the action threatens a violation of

Federal . . . law or requirements imposed for the protection of the environment."   40 C.F.R. §

1508.27(b).

43.     If, as a result of the EA, the agency concludes that an EIS is not required, the

agency issues a Finding of No Significant Impact ("FONSI"), 40 C.F.R. § 1501.4(e), which

presents the reasons why the action "will not have a significant effect on the human

environment . . .."   40 C.F.R. § 1508.13.

44.     The CEQ regulations further provide that "NEPA procedures must ensure that

environmental information is available to public officials and citizens before decisions are made

and before actions are taken."   40 C.F.R. § 1500.1(b).   Recognizing that "public scrutiny [is]

essential to implementing NEPA," *id*., the regulations further provide that "Federal agencies

shall to the fullest extent possible . . . encourage and facilitate public involvement in decisions which affect the quality of the human environment."   *Id*. § 1500.2(d).

**B.    Facts Giving Rise To Plaintiffs' Claims**

      **1.    The FWS Ends The "Split-Listing" of Chimpanzees.**

45.    The chimpanzee was originally listed in 1976 as "threatened" under the ESA, with a special rule issued pursuant to Section 4(d) of the statute that purported to exempt the *captive* members of the species from all of the protections of the statute.   *See generally* 80 Fed. Reg. 34500 (June 16, 2015 (explaining history of listing of captive chimpanzees).   In 1990, the FWS listed the wild chimpanzees as "endangered," but kept the *captive* members of the species listed as "threatened" with the attendant regulation under which they received no protection under the statute.   *See id.*

46.    In 2010, a coalition of animal welfare organizations, conservation groups, scientists, and other individuals, including Plaintiff NEAVS, petitioned the FWS to include the captive members of the species as "endangered" on the grounds that there was no legal basis for distinguishing between the captive and wild members of a species for purposes of a listing decision under the Act, and because the wholesale commercial exploitation of the captive members of the species – in laboratory research, entertainment, advertising, and the pet trade – was impairing efforts to conserve the *wild* populations since such exploitation both undermined important conservation efforts in other countries and contributed to poaching of wild chimpanzees, particularly infant chimpanzees, for use in the entertainment and pet trades.   As explained by world renowned chimpanzee expert Dr. Jane Goodall in a sworn affidavit submitted in support of the petition, "exploitation of captive chimpanzees . . . can increase the demand for

pet chimpanzees in parts of the world where such demand would be met by capturing wild chimpanzees, providing a financial incentive for local people to hunt chimpanzees for the live animal trade."

47.     On June 16, 2015, the FWS issued a final rule granting the petition, eliminating the separate classifications for captive and wild chimpanzees, and thereby extending to captive chimpanzees all of the protections afforded the endangered chimpanzee.   80 Fed. Reg. 34500 (June 16, 2015).   At a press conference announcing the final rule, Defendant Ashe explained to the public that the agency had made a "mistake" in denying captive chimpanzees the full protections of the ESA for decades, and conceded that such treatment "encourage[d] a culture that treats these animals as a commodity."

48.     The final rule providing captive chimpanzees the full protection of an "endangered" species under the ESA became effective on September 14, 2015.

**2.     <u>Yerkes' Efforts To Transfer The Chimpanzees To Wingham</u>**

49.     Yerkes is a research laboratory affiliated with Emory University in Atlanta, Georgia.   It has bred chimpanzees for behavioral and medical research for decades.

50.     Once captive chimpanzees were afforded protections of an "endangered" species under the ESA, Yerkes could no longer engage in activities that "take" these animals within the meaning of the ESA, without obtaining a permit from the FWS pursuant to Section 10 and making all the showings that are required by that provision.

51.     Instead of using the 90 days provided by the FWS between the announcement of the final rule and its effective date to apply for a permit to "take" or otherwise engage in any other prohibited activity with respect to the captive chimpanzees in its possession, Yerkes

decided to get rid of many, if not all, of its chimpanzee population *before* the listing rule became effective, and thereby avoid the requirements of Section 10(c) of the Act which provide for (1) publication of each permit application in the Federal Register; (2) that "[i]nformation received by the Secretary as part of any application shall be available to the public as a matter of public record at every stage of the proceeding," and (3) that "interested persons" shall be afforded the opportunity to submit "written data, view, or arguments with respect to the application."

52.     Although Yerkes sent some of its chimpanzees to a U.S. sanctuary and an AZA accredited U.S. zoo, it decided to send the eight chimpanzees at issue here to Wingham, an unaccredited zoo in England that has never housed, cared for, or exhibited chimpanzees. Yerkes then informed the FWS that it was donating the chimpanzees to Wingham.

53.     However, because the Wingham facility in which the chimpanzees would be housed was not yet constructed, Yerkes was unable to obtain the necessary CITES export permit from the FWS before September 14, 2015.   Accordingly, once that date passed, Yerkes was also required to apply for and obtain a Section 10 "enhancement" permit under the ESA, because the captive members of the species were included within the "endangered" designation of the species as a whole.

54.     Although Yerkes had already submitted to the FWS an application for a CITES export permit in June 2015, on September 28, 2015 Yerkes "supplemented" that application with materials intended to satisfy the criteria for a Section 10 enhancement permit.

55.     Yerkes' permit application materials reflect that the eight chimpanzees it intends to export to Wingham are all of breeding age, including two males (Lucas and Fritz) and six females (Agatha, Abby, Tara, Faye, Elvira, and Georgia).

56.     According to the "Specimen Reports" Yerkes provided to the FWS, most of the eight chimpanzees are genetically related to each other.    Four of the chimpanzees – Tara and Elvira, and Lucas and Fritz – are half siblings, i.e., Tara and Elvira share the same father (Jimoh) and Lucas and Fritz share the same mother (Bo).    In addition, *all* of the chimpanzees are closely related cousins – i.e., they share grandparents.

57.     Wingham is not accredited by the British and Irish Association of Zoos, nor by the Aquariums of the European Association of Zoos and Aquariums – the European equivalents of the U.S. Association of Zoos and Aquariums – nor is it a non-profit organization.    On the contrary, Wingham makes millions of dollars each year from ticket sales charged to its approximately 250,000 visitors per year.

58.     Wingham has never housed, cared for, or exhibited chimpanzees.

59.     Wingham stands to make tens of millions of dollars *more* each year from exhibiting chimpanzees, especially if it succeeds in breeding the Yerkes chimpanzees to make infant chimpanzees.

60.     In addition to charging the public to view its animals, Wingham engages in other commercial activities with respect to the animals included in its exhibit, including but not limited to commercial advertising and allowing its customers to have hands-on interactions with animals.

61.     Several accredited U.S. chimpanzee sanctuaries have made clear their willingness to give these chimpanzees a home in the United States.

62.     When it applied for its enhancement permit to export the eight chimpanzees, Yerkes represented that the export of the chimpanzees would "enhance the propagation and

survival" of the species for three reasons: (1) because Wingham would breed the chimpanzees in

strict accordance with the European Species Survival Program for chimpanzees ("EEP), which

oversees the breeding of endangered species by European zoos to insure against inbreeding and

the loss of genetic viability; (2) because Wingham would display the chimpanzees in a way that

would educate the public about the imperiled state of the chimpanzee, which in turn would foster

conservation efforts; and (3) because, in exchange for being allowed to export the chimpanzees,

Yerkes and Wingham would each donate approximately $2,000 a year for five years to the

Kibale Chimpanzee Project's Snare Removal Program in Africa and the Wildlife Conservation

Society – both of which are organizations engaged in chimpanzee conservation efforts.

     **3.**     **The Public, Including Chimpanzee Experts, Animal Welfare Organizations, Conservation Groups, Chimpanzee Sanctuaries, And Other Scientists Oppose Yerkes' Application And Urge That The Eight Chimpanzees Instead Be Placed In A U.S. Sanctuary.**

     63.     As required by Section 10(c) of the ESA, on October 15, 2015 the FWS published

notice of Yerkes' application for a Section 10 enhancement permit, and provided the public until

November 16, 2015 to submit written data, views, and arguments with respect to the application,

as provided by the Act.   80 Fed. Reg. 62089, 62091 (Oct. 15, 2015).

     64.     Those who commented overwhelmingly opposed issuance of the requested

permit.

     65.     On October 28, 2015 – before the close of the public comment period – the Kibale

Chimpanzee Project made public a letter written to Wingham – a copy of which was sent directly

to the FWS – explaining that it had *not* agreed to accept any money from Wingham in

connection with the Yerkes' permit application, and that, in fact, it had not even been told by

either Yerkes or Wingham that it was being used as "leverage" to obtain the requested permit.

That organization further made clear that, in fact, it *opposed* the proposed export of the chimpanzees to Wingham and that it was "advocating for the Yerkes chimpanzees to stay in the USA and be transferred to a volunteering chimpanzee sanctuary" which "would be best not just for the eight chimpanzees proposed for exportation to [Wingham], but also for the treatment, welfare, and conservation of chimpanzees in general."

66.     The Kibale Chimpanzee Project officials who authored the letter, including Dr. Jessica Hartel, Director of the Kibale Snare Removal Project; Dr. Richard Wrangham, Moore Professor of Human Evolutionary Biology, Harvard University; and Dr. Emily Otali, Field Manager for the Kibale Chimpanzee Project, further informed the FWS that "many chimpanzee welfare organizations in the USA are not supporting the transfer of the Yerkes chimpanzees to [Wingham]," which "includes, but is not limited to the Chimpanzee Species Survival Plan, AZA [U.S. Association of Zoos and Aquariums]/EAZA [European Association of Zoos and Aquariums], New England Anti-Vivisection Society, Release and Restitution for Chimpanzees, and Jane Goodall Institute USA."

67.     On October 28, 2015, Dr. Richard Wrangham – one of the worlds' leading experts on chimpanzees – sent comments to the FWS opposing the Yerkes' permit application on the grounds that (1) Wingham is not accredited and "therefore is not managed pursuant to sound principles of conservation science;" (2) "the European Endangered Species Programme Coordinators (EEP) oppose the move, as the chimpanzees are of unknown pedigree and are not eligible to participate in the species management program;" (3) "[t]he proposed donations by Yerkes and [Wingham] should not be allowed to offset the negative impacts of exporting these chimpanzees to an unaccredited exhibition facility,'"(4) "[i]t is imperative that all captive

chimpanzees are managed for conservation purposes in order to ensure that captive exploitation

of the species does not fuel poaching and trafficking in wild populations," but Wingham's

"substandard exhibition . . . would promote commercialization of the species," and hence "this

export would undermine conservation efforts, not enhance the survival of the species;" and (5)

"Yerkes should work with accredited sanctuaries in the U.S. to retire chimpanzees (which would

promote both conservation and animal welfare)."

68.    On November 9, 2015, the AZA submitted comments opposing the export permit

on the grounds that (1) Wingham is an unaccredited zoo; (2) Wingham's practices of allowing

public contact with primate species "*undermines important conservation efforts by increasing*

*the demand for exotic pets and decreasing the public's understanding of the status of the*

*species*;" (3) the named recipients of the proposed funding – Kibale Chimpanzee Project and

WCS – have refused the donations "on the grounds that they do not agree with the transfer," and

(4) Wingham is not a member of the EEP "and is therefore not part of any legitimate

conservation breeding program."    (Emphasis added).

69.    On November 13, 2015, Plaintiffs also submitted extensive comments and

exhibits opposing the Yerkes' permit application.    They pointed out that Yerkes had "failed to

disclose material information" and "made false statements" as to many other material facts,

within the meaning of the FWS's regulations governing such permits, 50 C.F.R. § 13.21(b)(2),

for many reasons.    For example, Plaintiffs explained that Yerkes had falsely represented that the

export would "enhance the propagation or survival" of the chimpanzee species because

Wingham would be breeding the chimpanzees in cooperation with the European Species

Survival Program ("EEP"), despite the fact that the EEP had issued a written statement, attached

to Plaintiffs' comments, stating that Wingham is not a member of the EEP and the EEP "does not support the proposed transfer" because Yerkes cannot verify that these chimpanzees are all of the *verus* subspecies and hence breeding of these chimpanzees could contribute to "subspecies hybridization" in "direct contrast" to the goals of the EEP.

70.     Plaintiffs further explained that breeding these chimpanzees would not contribute to the conservation of the species because the chimpanzees are all genetically related to each other, and they further pointed out that the "signage" proposed by Wingham could not possibly "enhance the survival" of the species through public education because it was demonstrably incorrect in content and because the FWS had already determined that such "educational" efforts do not, by themselves, contribute to enhancement of the species' survival.

71.     Plaintiffs further explained that the FWS could not issue an enhancement permit under Section 10 in exchange for a promise to contribute money to another organization because the plain language of the statute requires the agency to find that the actual export itself will "enhance the propagation or survival" of the species, and that, in any event, both the Kibale Chimpanzee Project and the Wildlife Conservation Society had declined to accept any such funding to assist Yerkes in obtaining a permit because both of those organizations opposed the proposed export.

72.     Plaintiffs further pointed out that Wingham had no experience caring for chimpanzees, and particularly chimpanzees raised in a laboratory setting who have extremely special needs that can only be met by well-trained and experienced chimpanzee caregivers. Plaintiffs explained that for this reason and because of the trauma inherent in separating the chimpanzees from their established social groups, shipping them by air to England, introducing

them to new social groups, and exposing them to new and inexperienced caregivers and the public through exhibition, the export of these chimpanzees would be extremely *detrimental* to their well-being, and hence the FWS could not make the necessary findings required by either Section 10 or CITES.   Plaintiffs also demonstrated that because the chimpanzees were of no use to the EEP and hence could not be used to replenish depleted populations in the wild, the export would also not "enhance the survival or propagation" of the species, and that because Wingham clearly intended to breed the chimpanzees, the export would actually *harm* conservation efforts by contributing to the black market in infant chimps.

73.    Plaintiffs also explained that because of the precedential nature of the decision, its effect on an endangered species, and the fact that the permit application was extremely controversial – as demonstrated by the many chimpanzee experts and other scientists who *opposed* the export – the FWS must comply with all of the requirements of NEPA before deciding whether to issue the requested permit.

74.    Plaintiffs further opposed the export on the grounds that several U.S. Sanctuaries, including some of the Plaintiff organizations and others, had agreed to take the chimpanzees and that this alternative would not only be best for the health and welfare of the chimpanzees, but would avoid any adverse consequences for chimpanzee conservation.

75.    Finally, Plaintiffs explained to the FWS that if it nevertheless decided to grant the requested permit based on any *additional* materials that had *not* been provided to the public as part of the application materials that were released to the public and subjected to public comment, it would need to reopen the comment period as required by both the plain language of

Section 10(c) of the ESA, as well as D.C. Circuit precedent, *Gerber v. Norton*, 294 F.3d 173, 179-82 (D.C. Cir. 2002).

76.     Plaintiff Jen Feuerstein also submitted comments opposing the export of the chimpanzees.   Having worked at Yerkes as a caregiver for several of the chimps, including Georgia, Tara, and Abby, Ms. Feuerstein explained that "[m]oving these chimps to a UK zoo with no independent accreditation and no experience caring for chimpanzees will not contribute in any way to the survival of the species;" that because the chimpanzees are all related to each other they are not suitable for breeding to enhance the propagation or survival of the species in the wild; and that separating the chimpanzees from their social groups to facilitate the transfer would be extremely detrimental to the well-being of the chimpanzees.   Ms. Feuerstein further explained that "issuing a permit for the export of these chimpanzees would set a precedent that could be further exploited by US owners of chimpanzees to dump chimpanzees at unaccredited facilities across the globe, under the guise of 'conservation;" that "[t]he chimps would no longer enjoy the protections of the USFWS once they leave the country;" and that "they and their offspring could end up in circuses, poorly run zoos, or the black market pet trade in chimpanzees."   Accordingly, she urged the FWS to deny the requested permit, and emphasized that "[t]he chimpanzees should be transferred to a professional sanctuary within the United States where they will not be bred or exhibited."

77.     Other animal welfare organizations, such as the Humane Society of the United States ("HSUS") and the Born Free Foundation, opposed the export permit for many of the same reasons discussed above.   In addition, HSUS submitted comments from more than 24,600 individuals who opposed the proposed export on the grounds that it would not contribute to the

conservation of the species and would be detrimental to the well-being of the eight chimpanzees, and who urged that the chimpanzees instead be placed in a U.S. sanctuary.

78.     Yerkes and the FWS were informed on multiple occasions that several U.S. sanctuaries are willing to take the eight chimpanzees.    For example, the Director of the Great Apes Sanctuary in Florida submitted a comment to the FWS opposing the export of the chimps to Wingham and explaining that "at least 5"of the accredited sanctuaries in the United States "would be willing to accept these eight chimpanzees from Yerkes," and that "[w]e are one of the sanctuaries willing to take the 8 Yerkes chimpanzees."

**4.      Less Than Ten Working Days After The Close Of The Comment Period The FWS Notified Plaintiffs That It Had Decided To Grant The Permit Based On Information That Was *Not* Part Of The Original Permit Application And Hence Was *Not* Subjected To <u>Any Public Comment</u>.**

79.     The comment period closed at midnight on November 16, 2015.

80.     At approximately 4 p.m. on November 27, 2015 – the Friday after Thanksgiving – the FWS notified Plaintiffs' counsel that the FWS had made a final decision to issue a permit and that the FWS therefore    "intends to issue" the permit requested by Yerkes within ten calendar days, or by Monday, December 5, 2015.    That notification, provided pursuant to the FWS's regulations, 50 C.F.R. § 17.22(e), further stated that "there has been a shift in the organization and amount being donated by Yerkes," and that "[t]he final donation will be $45,000 per year for five years to the Population & Sustainability Network" ("PSN") – an organization that deals primarily with educating women in underdeveloped countries about reproductive health and rights, and which has never done *any* work on chimpanzee conservation.

81.     As explained above, the application materials that were provided to the public

pursuant to the mandate of Section 10(c) of the ESA, and upon which the public commented,

stated that the financial contributions upon which Yerkes was relying to demonstrate that the

otherwise illegal export will "enhance the survival" of the chimpanzee species, would be made to

the Kibale Chimpanzee Research Project and Wildlife Conservation Society – both of which

made clear to both Yerkes and the FWS that they did not want any such funding and that they

*opposed* the proposed transfer of the chimpanzees.

82.     The application materials made available to the public pursuant to Section 10(c)

of the ESA did not include any mention of money being contributed to the PSN.   Hence, the

public was denied the opportunity before the FWS made a final decision on the permit to submit

"written data, views, or arguments with respect" to Yerkes' intention to attempt to meet the

statutory requirements applicable to the export of an endangered species by contributing money

to this organization.   Had Plaintiffs been provided this new information before a decision was

made, they would have collected and provided to the FWS information demonstrating that the

proposed project by the PSN would not "enhance the survival" of the species within the meaning

of Section 10(a)(1)(A).

83.     At the time the FWS informed Plaintiffs that it had decided to issue the requested

export permit, the agency had not complied with any of the requirements of NEPA.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim One - Violations of Section 10 of the Endangered Species Act

84.     In deciding to issue an enhancement permit to Yerkes authorizing it to export the

eight chimpanzees to an unaccredited zoo in England, without informing the public of a major

basis for the agency's decision    – i.e., that the FWS has decided that granting the permit will

"enhance the survival of the species" by giving money to the PSN –    at the time the application

was published in the Federal Register or at any other time during the public comment period held

pursuant to Section 10(c) of the ESA, 16 U.S.C. § 1539(c), Defendants have violated that

provision of the statute, and acted in a way that is arbitrary and capricious, an abuse of

discretion, and not in accordance with law within the meaning of Section 706(2) of the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

85.     In deciding to issue the enhancement permit based primarily on Yerkes'

commitment to arrange for money to be contributed to the Population & Sustainability Network,

Defendants have violated the substantive requirements that govern such permits under Section

10(a)(1)(A) of the ESA, 16 U.S.C. § 10(a)(1)(A), which require the FWS to find that the

otherwise unlawful activity – here, *the export of the chimpanzees to Wingham* – will *itself*

"enhance the propagation or survival" of the species.    The plain language of Section 10 does

not allow the FWS to sell enhancement permits – i.e., it does not permit the agency to allow an

otherwise unlawful activity with respect to an endangered species *in exchange for money being*

*contributed to an organization*.    Accordingly, by deciding to issue the permit to Yerkes on this

basis, Defendants have violated the plain language of Section 10 of the ESA and acted in a

manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of Section 706(2) of the ESA.

86.     Because Yerkes failed to provide any legitimate basis for the FWS to conclude that export of the eight chimpanzees to Wingham will "enhance the propagation or survival of the species," and, on the contrary, the record before the agency demonstrated that the export of these chimpanzees to this unaccredited zoo with no experience in caring for chimpanzees will only serve to *undermine* conservation of the chimpanzee species, Defendants have violated all of the substantive requirements of Section 10(a), 16 U.S.C. § 1539(a)(1)(A), as well as the agency's implementing regulations for that provision of the ESA.   For the same reasons, the FWS also cannot make the findings required by Section 10(d) of the ESA – i.e., that the permit was "applied for in good faith," will "not operate to the disadvantage of such endangered species," and is "consistent with the purposes and policy set forth" in the ESA.   Accordingly, Defendants have violated these provisions of the statute, and their implementing regulations, and acted in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

87.     In deciding to issue the requested enhancement permit to Yerkes despite evidence that in its application materials Yerkes misrepresented material information, including, but not limited to (1) the fact that Wingham would be breeding these chimpanzees only in cooperation with the European Species Survival Program ("EEP"), when Wingham is *not* a member of the EEP, the EEP does not consider these chimpanzees to be suitable for conservation breeding, and the EEP *opposes* the export of these chimpanzees to Wingham; and (2) that Yerkes and Wingham would be making financial contributions to the Kibale Chimpanzee Research Project

and the Wildlife Conservation Society, when, in fact, those organizations had not agreed to any

such arrangement and also *oppose* the export of these chimpanzees to Wingham, Defendants

violated their own implementing regulations that apply to all permits requested from the FWS,

50 C.F.R. § 13.21(b)(2)-(3).   For the same reasons, Defendants have acted in manner that is

arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the

meaning to the APA., 5 U.S.C. § 706(2).

88.     These violations of law injure Plaintiffs as described in ¶¶ 4-18.

## Claim Two – Violations of the Convention on International Trade in Endangered Species

89.     In deciding to issue the export permit to Yerkes, the FWS has violated the

requirements of the Convention on International Trade in Endangered Species ("CITES"), 27

U.S.T. 1087 (Mar. 3, 1973), because, based on the record before the FWS, the agency cannot

find that export of the chimpanzees to an unaccredited zoo in England will not "be detrimental"

to the animals or the chimpanzee species, or that the chimpanzees will be "prepared and shipped

as to minimize the risk of injury, damage to health or cruel treatment."    CITES, Article IV.

Accordingly, Defendants have also acted in a manner that is arbitrary and capricious, an abuse of

discretion, and not in accordance with law, within the meaning to the APA, 5 U.S.C. § 706(2).

90.     In deciding to issue the requested enhancement permit to Yerkes despite evidence

that in its application materials Yerkes misrepresented material information, as described in ¶ 69,

Defendants violated their implementing regulations that apply to all permits requested from the

FWS, 50 C.F.R. § 13.21(b)(2)-(3), and acted in manner that is arbitrary and capricious, an abuse

of discretion, and not in accordance with law, within the meaning to the APA., 5 U.S.C. §

706(2).

91.     These violations of law injure Plaintiffs as described in ¶¶ 4-18.

### **Claim Three – Violations Of The National Environmental Policy Act**

92.     By deciding to issue the enhancement and export permits to Yerkes without complying with *any* of the requirements of NEPA, 42 U.S.C. § 4321, and the Council on Environmental Quality's implementing regulations, including but not limited to failing to analyze and take into account (1) the environmental effects of that decision including the adverse impact this decision will have on efforts to conserve chimpanzees in the wild; and (2) the precedential effect this decision will have with respect to the disposition of *other* endangered captive chimpanzees, and without considering a reasonable range of alternatives, Defendants have violated NEPA and the CEQ implementing regulations, and acted in a manner that is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of Section 706(2) of the APA, 5 U.S.C. § 706(2).

93.     These violations of law injure Plaintiffs as described in ¶¶ 4-18.

### **Claim Four – Violations Of The Administrative Procedure Act**

94.     By basing its decision on information that was not provided to the public during the public comment period on the requested permit, the FWS has violated the notice and comment provisions of the APA, 5 U.S.C. § 553, and acted in a manner that is arbitrary and capricious, an abuse of discretion, and not in accordance with law within the meaning of Section 706(2) of the APA, 5 U.S.C. § 706(2).

95.     These violations of law injure Plaintiffs as described in ¶¶ 4-18.

   **WHEREFORE**, Plaintiffs request that the Court issue an order:

(1)     declaring that the FWS's decision to issue an export and enhancement permit to Yerkes to export the eight chimpanzees to Wingham violates the Endangered Species Act, CITES, NEPA, and the APA;

(2)     setting aside the FWS's decision to issue the enhancement and export permit to Yerkes;

(3)     enjoining the FWS from issuing any such enhancement and export permit to Yerkes unless and until the FWS comes into compliance with all of the requirements of the ESA, CITES, NEPA, and the APA, and all relevant implementing regulations;

(4)     awarding Plaintiffs their costs and reasonable attorneys' fees; and

(5)     awarding Plaintiffs any other relief that the Court may deem just and proper.

Respectfully submitted,


_____/s/_____
Katherine A. Meyer
D.C. Bar No. 244301
KMeyer@meyerglitz.com


_____/s/_____
Eric R. Glitzenstein
D. C. Bar No. 358287
Eglitzenstein@meyerglitz.com

Meyer Glitzenstein & Eubanks, LLP
4115 Wisconsin Ave., N.W.
Suite 210
Washington, D.C.    20016
(202) 588-5206
(202) 588-5049 (fax)

Attorneys for Plaintiffs

Date:    November 30, 2015